Nathan Agar and Christina Edith Agar v. Commissioner.
Agar v. Commissioner
Docket No. 69090.
United States Tax Court
T.C. Memo 1960-21; 1960 Tax Ct. Memo LEXIS 268; 19 T.C.M. (CCH) 116; T.C.M. (RIA) 60021; February 18, 1960
Nathan Agar, pro se, 15 Central Park West, New York, N. Y. Victor H. Frank, Jr., Esq., and Ellyne E. Strickland, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: This proceeding involves the following deficiencies in income tax: Year
Deficiency
1953
$ 567.90
1954
3,413.59
1955
4,025.56
The issue for decision is whether the payment to petitioner of $15,000 during each of the years in issue by his former employer was taxable income. Some of the facts were stipulated. Findings of Fact The stipulated facts *269 are so found and are incorporated herein by this reference. During the years in issue, Nathan Agar (hereafter referred to as the petitioner) and Christina Edith Agar were husband and wife, residents of New York City, and filed joint Federal income tax returns with the district director of internal revenue, upper Manhattan district, New York. By profession, petitioner is a certified public accountant. From 1913 through 1951, he practiced on his own behalf, maintaining offices at 51 Chambers Street in the City of New York. On January 1, 1951, he entered into partnership with Harry L. Marron, and the practice, formerly conducted by him individually, was thereafter continued under the firm name of Agar & Marron. In 1938 David D. Doniger & Co., Inc. (hereafter referred to as Doniger) retained petitioner as its accountant. This accountant-client relationship continued until late in 1950. Doniger, subsequently to become McGregor-Doniger Inc., was a New York corporation which produced and sold men's and boys' sportswear under the "McGregor" trademark. Between 1938 and 1950, its annual sales increased from $2,000,000 to approximately $30,000,000 to $35,000.000. During petitioner's tenure *270 as company accountant, Doniger did not employ a treasurer. Rather, petitioner, in addition to his normal accounting services, performed the duties of treasurer. In October of 1950, petitioner was replaced as company accountant by the firm of S. D. Leidsdorf & Company. For 1950, petitioner was paid $36,600 by Doniger as his annual retainer for services performed. In addition to a retainer, it was company practice to make payments to petitioner for work on special matters handled from time to time. As of December 31, 1950, petitioner was working on only one such special matter, a refund claim under the Internal Revenue Code. By early 1951, Doniger had fully paid petitioner for all services rendered by him as its accountant, other than for his work on the refund claim. Subsequently, the claim was allowed, and in January of 1952, Doniger paid petitioner a fee slightly in excess of $10,000 for work on this matter. On January 1, 1951, petitioner entered into an employment contract with Doniger whereby he was employed as its treasurer for the 5-year period extending to December 31, 1955. By virtue of the agreement, petitioner immediately assumed the duties of treasurer and a director *271 of the corporation. The contract provided petitioner was to receive a fixed annual salary of $35,000, payable in equal weekly installments, plus: "Percentage Compensation - A sum (hereinafter called the 'percentage compensation') not exceeding in the aggregate Forty Thousand ($40,000.00) Dollars for any year, which percentage compensation shall be payable on May 1, 1952 and annually thereafter with respect to the previous calendar year of service. The percentage compensation shall be equal to Four Thousand ($4,000.00) Dollars for each One Hundred Thousand ($100,000.00) Dollars, or major fraction thereof, of Adjusted Consolidated Net Earnings (as hereinafter defined) in excess of Two Million One Hundred Thousand ($2,100,000.00) Dollars for any year of service." In the event of removal for cause, petitioner was not entitled to any unpaid "fixed" or "percentage" compensation. In the event of any other termination of the contract by Doniger prior to its expiration, petitioner was to receive "fixed" compensasation to the termination date and "percentage" compensation for any partial annual period in "the amount obtained by multiplying the percentage compensation for the full year *272 in which the termination occurs by a fraction the numerator of which will be the number of full calendar months of the year in which the interim period occurred during which the Executive rendered services hereunder and the denominator of which will be twelve." plus, as full liquidated damages and not as a penalty, $35,000 if the termination occurred in 1951; $25,000 if the termination occurred in 1952; $15,000 if the termination occurred in 1953; $10,000 if the termination occurred in 1954; and $5,000 if the termination occurred in 1955. Throughout petitioner's association with Doniger, majority control of its stock was held by two brothers, Harry and William Doniger who also served as its president and executive vice-president, respectively. Throughout the 13-year period that petitioner was retained as the company public accountant, he was shown the highest respect by its officers, and his advice was relied upon and followed. Shortly after petitioner became corporate treasurer, the pleasant relationship previously existing between himself and the other members of Doniger's executive staff began to deteriorate. Differences of business opinion became commonplace between petitioner *273 and these individuals, as well as between petitioner and members of the Leidesdorf firm. In some instances, petitioner's reasoning and business acumen were criticized by Doniger personnel. During company meetings, William Doniger would accuse petitioner of errors which he maintained resulted in serious corporate losses. There was a tendency on the part of corporate personnel to rely more on the suggestions and recommendations of the Leidesdorf firm and less on those made by petitioner. On at least one occasion, William Doniger indicated at a meeting of various representatives of the trade that he had changed accountants as a result of an error made by the petitioner. Throughout this period, Doniger was an expanding, developing organization. The daily pace maintained within its offices was hectic and tense. In the words of a former executive, company personnel were expected to produce twice as much as the average man. As of January 1, 1951, petitioner, then either 63 or 64 years of age, was a healthy man. As of February 1952, he was extremely nervous, unable to concentrate for any extended period of time, and suffered lapses of memory. On February 13, 1952, petitioner advised Doniger, *274 both orally and in writing, that he was resigning his position as director and treasurer. After submission of his oral resignation, he went directly to Harry Doniger, informing him that he intended to institute a damage suit against the company for injuries sustained as a result of treatment received at the hands of company personnel. Harry Doniger told petitioner he should discuss the matter with Bernard Lang, legal counsel for the company, since deceased. The particulars of the transaction were then left to Lang, the company being willing to honor any agreement arrived at by Lang and the petitioner. Originally the company had instructed Lang to "settle" for $10,000 or $30,000, but petitioner insisted on $45,000. After some discussion, it was orally agreed that petitioner was to receive $45,000 from Doniger, payable in 3 annual installments of $15,000 during 1953, 1954 and 1954. Written agreements were prepared to evidence the transaction, the first of which was totally unacceptable to the petitioner who had discussed its content with his son-in-law, an attorney. As finally reached, the agreement was in the form of a letter from petitioner to Doniger dated February 13, 1952, accepted *275 under the latter's seal, which read as follows: "Gentlemen: "For many years prior to 1951 I was the accountant for your company; and pursuant to a contract dated as of January 1, 1951, I thereafter served as Director and Treasurer of your company. In the course of my duties I handled various matters not only for David D. Doniger & Co., Inc., but the stockholders and the families of the stockholders, and their corporations. "I have decided to go back to the practice of public accounting. The purpose of this letter is to set forth the basis upon which we have agreed for a termination of our relations. "With this letter I am handing you my resignation as Treasurer and Director of David D. Doniger & Co., Inc., effective immediately. "You agree as follows: you will pay me the sum of $15,000 on January 15, 1953, $15,000 on January 15, 1954, and $15,000 on January 15, 1955. "The foregoing provisions supersede the provisions of the agreement dated as of January 1, 1951, they cover all claims of any kind and character, whether under such agreement or otherwise I may have or hereafter have arising out of past matters; they constitute our entire agreement, and they may not be modified *276 orally. Please indicate your acceptance in the space provided. "(sgd) NATHAN AGAR" Petitioner addressed anoter letter to Doniger on February 13, 1952, to the attention of Harry E. Doniger, president, wherein he stated: "Dear Sirs: "In connection with the severance of my relations with your company I want you to know that it was with a great deal of regret that I arrived at this decision. I felt, however, that I wanted to return to the practice of accounting on my own behalf. "I have many happy recollections of my association with your company; and I can assure you that I will never voluntarily do you any harm. On the contrary, if at any time I can be of assistance to you, I will be very pleased to help you in any way within reasonable bounds. "Yours very truly, "(sgd) NATHAN AGAR" Even though the partnership agreement between petitioner and Marron specified that petitioner should be returned to the pay-roll of Agar & Marron at the same rate as Marron, should his contract with Doniger be terminated, petitioner was not so restored until some 3 or 4 weeks after leaving the corporation. The first work performed by petitioner for that partnership was on April 22, 1952. *277 In accordance with its agreement, Doniger made 3 payments of $15,000 to the petitioner by checks dated January 16, 1953, January 8, 1954, and January 17, 1955. On its books the company charged these payments to its Legal and Professional account. No part of the $15,000 installment received by petitioner in each of the years in issue was included in the joint returns which he filed with his wife. Their 1953 Federal income tax return had the following statement attached to it: "During 1953 Nathan Agar received $15,000.00 representing the first instalment of total payments of $45,000.00 which he is to receive in settlement of a claim of libel. This claim resulted from certain actions and statements by officers of a former corporate employer. There had been a contract of employment between this employer and taxpayer, which provided for liquidated damages of $25,000.00 to the taxpayer if the employer violated the agreement in 1952; and liquidated damages of lower amounts if the employer violated the agreement subsequent to 1952. The taxpayer voluntarily left his employment in 1952 and proposed to institute suit for damages for libel. The settlement of $45,000. was made to prevent action *278 being instituted. It is the understanding of the taxpayer that, under the circumstances outlined above, the receipt of the $15,000. instalment in 1953 is exempt from taxation." Similar statements were attached to their 1954 and 1955 returns. Respondent determined a deficiency in income tax for each of the years 1953, 1954, and 1955, based on the inclusion in income for each of those years of the $15,000 installment received by the petitioner from Doniger. Opinion The only issue is whether the $45,000 received by petitioner from Doniger during the years under consideration was income within the meaning of section 22(a) of the 1939 Code and section 61 of the 1954 Code. Petitioner's position is that the various $15,000 payments were in the nature of general or compensatory damages, received in settlement of his proposed suit against Doniger for injury to his personal reputation and health. Thus, he claims the amounts received did not constitute income. In support of that contention he cites , and Sol. Op. 132, C.B. I-1, 92 (1922), both of which stand for the general proposition that amounts received in settlement of a claim for damages *279 on account of injury to personal reputation are not income, and thus not taxable. The courts have construed the statutory definition of gross income broadly in recognition of "the intention of Congress to tax all gains except those specifically exempted." , rehearing denied . In light of this principle, as well as respondent's determination that the amounts in issue constituted income, petitioner must bring himself squarely within the exemption from tax upon which he bases his case; i.e., that the $45,000 was received in settlement of his claim for damages resulting from injury to his personal reputation. See (D. Tenn., 1959). In our opinion he has not succeeded. In reaching this conclusion we have assumed that the amounts in question were paid petitioner by Doniger in settlement of his proposed libel suit, an assumption which lacks much in the way of support by this record. Nevertheless, even with the benefit of this assumption petitioner cannot prevail, for it is at once apparent that there has been no proof that the amounts *280 were paid as recompense for injury to his personal reputation. The facts upon which petitioner maintains his cause of action were based do not indicate the presence of any attacks upon his personal integrity, character, or reputation. There is no evidence tending to show that he was called dishonorable or not trustworthy by any member of Doniger's executive staff. Instead, the record rather affirmatively confirms that his personal reputation both before, during, and after his association with Doniger as its treasurer was never once questioned. The closest this record comes to establishing injury to petitioner's personal reputation is a claim that, on more than one occasion, William Doniger called him an obscene name; a name whose use under some circumstances might have no opprobrious connotations at all. Actually, the abuses of which petitioner complains took the form, if anything, of attacks upon his business judgment. Thus, the damages alleged to have been paid as a result thereof would not fall within the exemption from tax afforded payments for injuries to personal reputation. Rather, they would more properly be characterized as payments made in satisfaction of injuries to petitioner's *281 business reputation as compensation for past or future income which may have been or might be lost, and thus, being compensatory by nature, would be taxable as ordinary income. See , where we said beginning at page 203: "Where the primary purpose of litigation is to vindicate the personal reputation and character of a taxpayer, the proceeds have been held not to be taxable, , and the expenses of litigation not deductible. . * * * Where, however, the cause for engaging counsel and the benefit sought is primarily the protection of petitioner's business, the expense is an ordinary and necessary business expense and hence a deductible item." In the absence of evidence tending to establish that the amounts in issue were paid on account of injuries to petitioner's personal reputation, we sustain respondent's determination that they constituted income within the meaning of the Internal Revenue Code and taxable as such. Moreover, as noted above, the record fails to support the contention that these payments were made in settlement of petitioner's proposed *282 suit for defamation. The nature of payments such as these depends upon the intention with which they are made, which in the final analysis is a question of fact to be decided from a consideration of all the factors surrounding actual payment. . While it is true, as petitioner contends, that Doniger was under no obligation, contractual or otherwise, to make these payments prior to its acceptance of his letter of resignation, this fact in no way establishes that the payments were made by way of settlement of his alleged claim of libel. In point of fact, the testimony of Harry Doniger, appearing for the respondent, would lead us to conclude that, insofar as the company was concerned, the payments were made as "extra" compensation for services rendered by petitioner over his years of service to Doniger. For example, when asked on direct examination why these payments were made, Harry Doniger replied: "We felt this way, here he left his private practice. It wasn't until this morning that I knew he had an interest downtown, but that had nothing to do with it. He was in private practice many years with us and other accounts. He left his *283 private practice. He joined our company. We had a contract for a certain amount of money which the contract states. "We felt we owed Mr. Agar something. We felt we would leave it to Mr. Lang to work out what we owed him for giving up his private practice and coming to us for a year and then leaving. * * *
"Mr. Lang handled the whole thing. Whatever Mr. Lang and Mr. Agar arrived at was okay with us. I would say it was severance. I would say it was paying Mr. Agar for that year of unhappiness he had with us, as he stated, and for the years that he worked with us, and we were saying good-bye." And again, on cross examination, in response to a similar question, Harry Doniger replied: "We felt, Mr. Agar, sincerely, that you, coming from private practice and we had had many happy years together and we worked well together - you came to our company - for some reason or other it didn't work * * * Then you resigned that day. Then you said you were leaving the company, and you got all excited about it. I told you to go up and see Ben. That I do remember. You went up to see him. You worked this out with Ben. Ben told us what you wanted, which was $45,000. We thought it was too much. *284 "The reason we wanted to do it, Bill and myself, was because of the relationship we had had with you for previous years, plus the year you spent with us, plus giving up your private practice. We felt sorry about it. From that point on, we told Ben to do the best we could. We said 'Give him $30,000, but straighten it out with him.' You wanted $45,000. You got it." While we might be persuaded to say that petitioner, in good faith, considered he had a valid claim against Doniger, and further considered the payments in question to have been made in recognition of that claim, we cannot agree that this also represented Doniger's understanding of the matter. It is quite possible that petitioner's failure to establish his case resulted from an inability to elicit testimony from the only other party to the transaction, Bernard Lang, who has since died. However, we must deal with the record we have before us, and not one which might have been made had Lang's death not intervened. Due to concessions as to other issues, Decision will be entered under Rule 50.